# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 50397-2-II |
| Respondent, | |
| v. | |
| ALBERT K. SMITH, | PUBLISHED IN PART OPINION |
| Appellant. | |

MELNICK, J. — Albert Smith appeals his convictions of theft in the first degree and identity theft in the first degree. In the published part of this opinion, we conclude the trial court did not err in applying the free crimes aggravating factor. In the unpublished portion, we conclude the court did not abuse its discretion in denying a mistrial motion and it did not commit reversible error in sentencing Smith. We also reject Smith's assertions in his statement of additional grounds (SAG) and supplemental SAG. We affirm Smith's convictions and sentence.

## FACTS[1]

Smith's convictions are based on a series of checks he cashed at the expense of his wife's employer, Spaeth Transfer, a moving and storage company that operated out of Bremerton. Smith's wife, Sharyl Smith,[2] worked as the company's bookkeeper between October 2012 and October 2015. Ultimately, Smith cashed 176 checks totaling $264,500 between December 2014

---

[1] The following facts relate to the published portion of this opinion. Additional relevant facts will be related in the unpublished portion.

[2] To avoid confusion, we refer to Sharyl Smith by her first name. We intend no disrespect.

and November 2015. A jury found Smith guilty of both identity theft in the first degree and theft in the first degree. It also found that both crimes were major economic offenses.

The State submitted a sentencing memorandum where it calculated Smith's offender score as 21. It requested an exceptional sentence above the standard range of 100 months on both counts and that the sentences on each count be served consecutively. The State cited the jury's finding of the major economic offense aggravator as well as an additional aggravator that, because of Smith's high offender score, some of the current offenses would go unpunished. RCW 9.94A.535(2)(c). The court determined Smith had an offender score in excess of 9.[3]

The trial court sentenced Smith to the statutory maximum on each conviction count, 120 months, to be served consecutively. The trial court also orally found that Smith's current offenses did not constitute the same criminal conduct. It cited the State's sentencing memorandum, which argued that the crimes did not occur at the same time or place.

The trial court entered written findings of fact supporting its exceptional sentence:

> (1) The offenses do not constitute same criminal conduct.
> (2) The jury found that the crimes were major economic offenses.
> (3) The defendant's high offender score results in some crimes going unpunished if sentenced concurrently.

Clerk's Papers (CP) at 193. Based on those findings, the court entered a conclusion of law that an exceptional sentence was appropriate. Smith appeals.

---

[3] In the unpublished portion of this opinion, we conclude the court erred in calculating Smith's offender score; however, it clearly exceeded 9 points.

ANALYSIS

I.    FREE CRIMES AGGRAVATING FACTOR

Smith argues that the trial court erred in applying the free crimes aggravator,[4] which applies when some of the current offenses would otherwise go unpunished. He contends that the aggravator does not apply in cases like this one, where only one conviction would go unpunished. We disagree.

A.    Principles of Statutory Interpretation

The interpretation of a statute involves a question of law we review de novo. *State v. Evans*, 177 Wn.2d 186, 191, 298 P.3d 724 (2013). The primary goal of statutory interpretation is to determine and give effect to the legislature's intent. *State v. Larson*, 184 Wn.2d 843, 848, 365 P.3d 740 (2015). To determine legislative intent, we first look to the plain language of the statute. *Larson*, 184 Wn.2d at 848. We consider the language of the provision in question, "'the context of the statute in which the provision is found, related provisions, and the statutory scheme as a whole.'" *Larson*, 184 Wn.2d at 848 (internal quotation marks omitted) (quoting *State v. Ervin*, 169 Wn.2d 815, 820, 239 P.3d 354 (2010).

If the plain meaning of a statute is unambiguous, we apply that plain meaning as an expression of legislative intent. *Larson*, 184 Wn.2d at 848. To determine the plain meaning of an undefined statutory term, we may look to the term's dictionary definition. *State v. Monfort*, 179 Wn.2d 122, 130, 312 P.3d 637 (2013).

A statute is ambiguous when it is subject to more than one reasonable interpretation. *Evans*, 177 Wn.2d at 192-93. When a statute is ambiguous, we first attempt to resolve any ambiguity and determine the legislature's intent by considering principles of statutory

---

[4] RCW 9.94A.535(2)(c).

3

construction, legislative history, and relevant case law. *State v. Reeves*, 184 Wn. App. 154, 158, 336 P.3d 105 (2014). If these indications of legislative intent are insufficient to resolve the ambiguity, we must apply the rule of lenity and construe the statute in favor of the defendant. *Reeves*, 184 Wn. App. at 158-59.

B.      Legal Background

A defendant's standard sentencing range is based on his or her offender score. Under RCW 9.94A.525, a trial court calculates a defendant's offender score based on prior convictions. RCW 9.94A.589(1)(a) provides that when a defendant is sentenced for multiple current offenses, the offender score for each current offense is determined by treating the other current convictions as prior convictions.

The standard range sentence for both of Smith's crimes reached its maximum with an offender score of 9. RCW 9.94A.510; *State v. Alvarado*, 164 Wn.2d 556, 561, 192 P.3d 345 (2008). This fact means that when a defendant's offender score equals or exceeds 9, other prior and other current offenses do not increase the standard sentence range. *Alvarado*, 164 Wn.2d at 563. A defendant whose offender score is at or above 9 will have the same standard range sentence regardless of the number of current or prior offenses. *State v. France*, 176 Wn. App. 463, 468-69, 308 P.3d 812 (2013). In this situation, a standard range sentence fails to punish the defendant for having committed multiple current offenses. *Alvarado*, 164 Wn.2d at 563.

The free crimes aggravator anticipates such a scenario and allows the trial court to impose an exceptional sentence when "[t]he defendant has committed multiple current offenses and the defendant's high offender score results in some of the current offenses going unpunished." RCW 9.94A.535(2)(c). Once the court determines that some of the defendant's current offenses will go unpunished, it has discretion to impose an exceptional sentence on all current offenses. *France*,

4

176 Wn. App. at 468-69. The trial court may make this determination without any finding by the jury. RCW 9.94A.535(2).

C.     Smith's Crimes

Here, Smith argues that the free crimes aggravator cannot apply when the defendant is charged with only two current offenses because only one offense would be unpunished. He cites to the language in RCW 9.94A.535(2)(c) that "*some* of the current offenses" would go unpunished. (Emphasis added.). He argues that because "some" is synonymous with a "few," this aggravator is inapplicable when only a single offense is unpunished.[5]

Smith's interpretation is inconsistent with the plain language of RCW 9.94A.535(2)(c). According to WEBSTER'S THIRD INTERNATIONAL DICTIONARY 2171 (2002) (Webster's), "some of the current offenses" can properly refer to a single offense. First, Webster's states that when "some" acts as a pronoun, as it does here, it can be used either in the singular or plural. Webster's at 2171. Second, there are two applicable definitions: "one person or thing among a number" and "one indeterminate quantity, portion, or number as distinguished from the rest." Webster's at 2171. Either could apply to single or multiple unpunished offenses.[6]

---

[5] For support, Smith cites the *Collins English Dictionary*. However, we have found no Washington case that relied on that dictionary as an authoritative source. It has been cited only twice, in both instances as an alternative definition. *See Jametsky v. Olsen*, 179 Wn.2d 756, 766 n.5, 317 P.3d 1003 (2014); *Boeing Co. v. Aetna Cas. & Sur. Co.*, 113 Wn.2d 869, 895 n.10, 784 P.2d 507 (1990) (Callow, C.J., dissenting).

[6] A recent unpublished decision, which we find persuasive, came to the same conclusion. *State v. Phillips*, No. 35115-1-III, slip op. at 12 (Wash. Ct. App. May 29 (unpublished), http://www.courts.wa.gov/opinions/pdf/351131_unp.pdf, *review denied*, 191 Wn.2d 1020 (2018). "When we think about quantities that do not qualify as 'some,' we think of 'all' and 'none.' By contrast, 'one' plainly qualifies as 'some.'" *Phillips*, slip op. at 12. The court concluded that, based on "the commonly understood meaning of 'some,' [the free crimes aggravator] applies where a defendant's high offender score would allow one crime to go unpunished." *Phillips*, slip op. at 12.

Smith also argues that the legislature's use of "some" in the free crime aggravator must mean more than one because the legislature has used the phrasing "one or more" in other places. Br. of Appellant at 22-23; *see* RCW 9.94A.535(3)(h) ("The current offense involved domestic violence . . . and *one or more* of the following was present." (Emphasis added.)); RCW 9.94A.537(6) ("If the jury finds . . . *one or more* of the facts alleged by the state in support of an aggravated sentence . . . ." (Emphasis added.)). He relies on a maxim of statutory construction that when the legislature uses different terms, we presume that the legislature intended for those terms to have a different meaning. *See Foster v. Dep't of Ecology*, 184 Wn.2d 465, 473, 362 P.3d 959 (2015).

But that maxim is only a presumption, and two factors demonstrate its inapplicability here. First, the dictionary definition states that "some" may be used in the singular or plural, and can refer to one or multiple things among a group. This definition is consistent with the remaining text of RCW 9.94A.535(2)(c), which applies when the defendant has committed multiple offenses with not all of them resulting in punishment. Applied here, two convictions plainly qualify as multiple offenses, and one offense would go unpunished.

Second, interpreting the free crimes aggravator to apply only when more than one crime is unpunished leads to a strained result that is not supported by the statute's text. Nothing in RCW 9.94A.535(2)(c) suggests that the legislature intended a defendant to avoid additional punishment when he or she is convicted of two crimes at once, but not three. We avoid construing a statute in a manner that results in unlikely or strained consequences. *State v. Barbee*, 187 Wn.2d 375, 389, 386 P.3d 729 (2017). *State v. Phillips*, No. 35115-1-III, slip op. at 13 (Wash. Ct. App. May 29, 2018) (unpublished), http://www.courts.wa.gov/opinions/pdf/351131_unp.pdf, *review denied*,

191 Wn.2d 1020 (2018), also addressed this issue and concluded that it would be arbitrary to allow one crime to go unpunished but not two.

Finally, Smith argues that we should apply the rule of lenity. The rule of lenity applies to ambiguous criminal statutes, which we will strictly construe in the defendant's favor. *State v. Breaux*, 167 Wn. App. 166, 179, 273 P.3d 447 (2012). Because the free crimes aggravator statute is not subject to two reasonable interpretations, it is not ambiguous, and the rule of lenity does not apply.

We therefore conclude that the trial court did not err in applying the free crimes aggravator to impose an exceptional sentence on Smith.[7] We affirm Smith's convictions and sentence.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040 it is so ordered.

## ADDITIONAL FACTS

While working as Spaeth's bookkeeper, Sharyl had responsibility for the company's payables and receivables accounts, which included identifying money remitted by customers, paying for shipments, and paying bills. Sharyl also assisted drivers with their payments for various expenses like fuel and truck repairs. To forward the necessary funds, Spaeth used a third-party business, Comdata. When on the road, Spaeth's drivers would have Comdata checks that they could fill out and use as cash. To use a check, drivers would call Sharyl. She had a list of preprinted numbers that corresponded to a certain dollar amount. A driver would fill out the check using that number.

---

[7] In the unpublished portion of this case we analyze Smith's other issues regarding his sentence.

After a driver used a check, Comdata would bill Spaeth. Spaeth would repay Comdata the advanced funds plus a fee and deduct the total from the driver's paycheck. Spaeth had a policy to repay Comdata using hard-copy checks, rather than online. Sharyl had responsibility for issuing Comdata check numbers, tracking which drivers used checks so Spaeth could bill those drivers, and paying Comdata.

When Sharyl left her position in October 2015, Jenay Ingalls became Spaeth's bookkeeper. Ingalls had been a long-time employee and would later become Spaeth's president. She noticed that Sharyl had started making payments to Comdata online, contrary to company policy. Ingalls found this activity unusual, and when she asked the company's president about the online payments, he appeared stunned. Ingalls also found a box of Comdata checks in Sharyl's desk. Ingalls knew of no reason for Sharyl to have the checks. Spaeth did not hand out Comdata checks. If a driver came to the office, Spaeth would give the driver money.

Ingalls requested copies of the checks from Comdata. Almost all of them were written out to Smith with some to Sharyl. Although Ingalls found documentation relating to checks that had been used by drivers, she found none of the required paperwork for Comdata checks written out to Sharyl or Smith. Ultimately, Smith cashed 176 Comdata checks totaling $264,500 at local Moneytree branches between December 2014 and November 2015.

The State charged Smith as both a principal and an accomplice with theft in the first degree and identity theft in the first degree. Both charges alleged an aggravating factor of a major economic offense.

I.    TRIAL

In a pretrial motion, Smith moved to exclude Ingalls's testimony that checks written to Smith were unauthorized. Smith argued that Ingalls lacked personal knowledge about whether the transactions had been authorized. The court granted Smith's motion.

During argument on the issue, the court clarified that Ingalls would be limited to testifying on issues of which she had personal knowledge and that she could not make deductions based on other information. The court stated that although the State had presented its argument as if Ingalls knew who wrote the Comdata checks, Ingalls could not testify to that fact if she lacked personal knowledge.

During trial, the State presented Ingalls's testimony regarding her discovery of the Comdata checks when she transitioned into the bookkeeper position. The State asked about the last of the Comdata checks:

Q. [A]re you able to make out the date that this Comdata check was written?

A. October 31, 2015.

Q. And who was in charge of the finances at Spaeth Corporation on that date?

A. Well, it would have been me.

Q. Did you authorize this check?

A. No. *That's written by Sharyl*.

Q. Now, the next-to-the-last page—

Report of Proceedings RP (Mar. 1, 2017) at 334-35 (emphasis added). Smith objected:

[Defense counsel]: Objection. Personal knowledge there.

THE COURT: I'm going to sustain the objection with regards to the witness's statement that it was written by Sharyl.

If you want to lay additional foundation, you can, [Prosecutor].

9

[Defense counsel]: I ask to strike that from the record as well.

THE COURT: Members of the jury, you're asked to disregard the statement about that check being written by Sharyl Smith.

Do you want to lay additional foundation, [Prosecutor]?

[Prosecutor]: No, Your Honor.

Q. You did not write that check?

A. No.

RP (Mar. 1, 2017) at 335-36.

The following day, after the State rested, Smith moved for a mistrial based on Ingalls's testimony. The court denied the motion, stating that it instructed the jury to disregard the testimony, that the court assumed that the jury followed its instruction, and that it had no reason to believe otherwise. In closing argument, Smith again referenced Ingalls's comment, stating that the judge had instructed the jury to ignore it.

The jury found Smith guilty of both identity theft in the first degree and theft in the first degree. The jury also found that both crimes were major economic offenses.

II.     SENTENCING

Before sentencing, the State filed a sentencing memorandum listing Smith's criminal history and calculating Smith's offender score to be 21. The memorandum included a list of Smith's prior felony convictions from 1992 through his most recent prior conviction in 2012. As proof of those convictions, the State attached a printout of Smith's "individual case history," which listed all of Smith's prior convictions.

The State requested an exceptional sentence, above the standard range, of 100 months on each count, to run consecutively. The State relied on two aggravating factors. First, the jury's

finding of the major economic offense aggravator, and second, some of the current offenses would go unpunished.

Smith disputed his offender score. He alleged that some of his prior convictions should be considered to be the same criminal conduct. He did not specify which ones. Smith stated that he did not have an opportunity to investigate but requested a continuance to allow him to do so. The trial court denied the request, stating that it would proceed to sentencing.

Smith also argued that the State's individual case history listing his prior convictions was insufficient to establish his criminal history by a preponderance of the evidence. In response, the State filed certified copies of the judgement and sentence for Smith's convictions from 1997 onward, which the State said accounted for an offender score of 15. Smith did not object to the judgment and sentences. Lastly, Smith argued that his current offenses should not be scored against each other because they were the same criminal conduct.

The trial court sentenced Smith to the statutory maximum of 120 months on each count, to be served consecutively. Leading up to its decision, the court commented,

> I don't think when you combine the criminal history that Mr. Smith has with the amount of money that was stolen, with the condition of the owner of the business who was having to deal with this, . . . I don't think you can have a clearly excessive sentence.

RP (Mar. 31, 2017) at 20. "[T]he only thing I can do at this point is . . . whatever I can to make sure that Mr. Smith is not out in our community committing these offenses." RP (Mar. 31, 2017) at 20. The court concluded that, if someone asked why Smith did not get the maximum penalty, "I don't know what I would tell them. I'd say, 'You're right. You're absolutely right.'" RP (Mar. 31, 2017) at 21.

The trial court also found that Smith's current offenses did not constitute the same criminal conduct. It cited the State's sentencing memorandum, which argued that the crimes did not occur

11

at the same time or place. The court did not address Smith's argument that some of his prior offenses, which he did not identify, should be considered the same criminal conduct.

The trial court entered written findings of fact supporting its exceptional sentence. Based on those findings, the court concluded that an exceptional sentence was appropriate. In Smith's judgment and sentence, his offender score is listed as 21.

Smith appeals.

## ANALYSIS

### I. MOTION FOR A MISTRIAL

Smith argues that the trial court erred when it denied his motion for a mistrial, based on Ingalls's testimony. We disagree.

We review a trial court's denial of a mistrial motion for an abuse of discretion. *State v. Emery*, 174 Wn.2d 741, 765, 278 P.3d 653 (2012). A court's denial of a mistrial motion is an abuse of discretion "only 'when no reasonable judge would have reached the same conclusion.'" *Emery*, 174 Wn.2d at 765 (internal quotation marks omitted) (quoting *State v. Hopson*, 113 Wn.2d 273, 284, 778 P.2d 1014 (1989)).

In evaluating a motion for a mistrial, we consider (1) the seriousness of the irregularity, (2) whether the irregularity involved cumulative evidence, and (3) whether the court instructed the jury to disregard the evidence. *Emery*, 174 Wn.2d at 765. We assesses these factors with deference to the trial court because it is in the best position to discern prejudice. *State v. Garcia*, 177 Wn. App. 769, 776-77, 313 P.3d 422 (2013).

The trial court has broad discretion to cure irregularities at trial that result from a witness's improper statements. *State v. Gamble*, 168 Wn.2d 161, 177, 225 P.3d 973 (2010). In some instances, a curative instruction may be insufficient to remove any prejudicial effect. *Gamble*, 168

Wn.2d at 177; *Hopson*, 113 Wn.2d at 284-85. We review whether the improper testimony, in the context of all the evidence, was so prejudicial so as to prevent a fair trial. *Gamble*, 168 Wn.2d at 177. A trial court should grant a mistrial only if a fair trial will be ensured by nothing short of a mistrial. *Emery*, 174 Wn.2d at 765.

Here, none of the three factors weigh in favor of granting a mistrial. First, the irregularity was not serious.[8] As an initial matter, the allegedly improper testimony was not significant under the circumstances. Ingalls made the comment spontaneously, while discussing her transition to taking over the bookkeeping role from Sharyl and the final Comdata check. The State did not ask a question that elicited the remark. The improper testimony may have passed unnoticed except for Smith's objection, his request for it to be stricken, and his reference to it in his closing argument.

Second, Ingalls's comment was largely cumulative of her other, properly admitted statements. Ingalls testified that as bookkeeper, Sharyl was responsible for all parts of the check-issuing process, i.e., providing Comdata check numbers, tracking where money was billed, and paying Comdata. Although no other evidence expressly stated that Sharyl wrote the last Comdata check, the check had a date for the Saturday immediately after Sharyl left the company. Ingalls, who took over the bookkeeping role and would have been the person in charge of checks, testified that she had not written it.

Third, the trial court sustained Smith's objection and instructed the jury to disregard Ingalls's testimony that Sharyl wrote the check. We presume that a jury follows the instructions provided by the trial court. *State v. Allen*, 182 Wn.2d 364, 380, 341 P.3d 268 (2015).

---

[8] The State argues that the testimony was improperly excluded because Ingalls had personal knowledge that Sharyl issued the check. But she never testified that she saw Sharyl write the check, and testified only to facts that provided inferences to support her statement.

Smith also argues that Ingalls's testimony violated a pretrial ruling prohibiting such testimony. The record is unclear if the court strictly forbade testimony that Sharyl wrote the checks, or if it merely limited Ingalls's testimony to issues on which she had personal knowledge. "[W]hat I want to make sure is that we're limiting the scope of her testimony to what she has personal knowledge of." RP (Feb. 27, 2017) at 49. In either case, in response to Smith's objection, the trial court allowed the State to present additional foundation, suggesting that the court did not view the error to be particularly egregious.

We conclude that the trial court did not abuse its discretion in denying Smith's motion for a mistrial.

II.     OFFENDER SCORE CALCULATION

Smith argues that the trial court erred in calculating his offender score by improperly counting convictions that the State failed to prove, by failing to conduct a same criminal conduct analysis for his prior convictions, and by ruling that his current convictions did not constitute the same criminal conduct.

The State concedes that the trial court erred in calculating Smith's offender score, but argues that any error was harmless because Smith's offender score, properly counted, exceeded 9. We accept the State's concession and agree that any error was harmless.

A.     Proof of Offender Score

A trial court calculates a defendant's offender score by accounting for the defendant's prior convictions "along with the 'seriousness level' of the current offense." *State v. Arndt*, 179 Wn. App. 373, 377-78, 320 P.3d 104 (2014) (internal quotation marks omitted) (quoting *State v. Ford*, 137 Wn.2d 472, 479, 973 P.2d 452 (1999)). A defendant's offender score is the total points accrued based on prior convictions and any other current offenses. RCW 9.94A.525; *State v.*

*Olsen*, 180 Wn.2d 468, 472, 325 P.3d 187 (2014). This calculation establishes a defendant's presumptive standard sentencing range for each seriousness level. *Arndt*, 179 Wn. App. at 377.

In calculating a defendant's offender score, the existence of any prior convictions is a question of fact. *Arndt*, 179 Wn. App. at 378. The State must prove prior felony convictions by a preponderance of the evidence. *Arndt*, 179 Wn. App. at 378; *see* RCW 9.94A.500(1). Although the best method of proving a prior conviction is for the State to produce a certified copy of the judgment, the sentencing court may also admit other comparable documents of record or transcripts of prior proceedings to establish a defendant's criminal history. *In re Pers. Restraint of Adolph*, 170 Wn.2d 556, 568, 243 P.3d 540 (2010). However, to prove the existence and validity of a prior conviction the State must do more than present an unsupported criminal history summary. *State v. Hunley*, 175 Wn.2d 901, 917, 287 P.3d 584 (2012).

We review the trial court's calculation of a defendant's offender score de novo. *Olsen*, 180 Wn.2d at 472. We review underlying factual determinations for abuse of discretion. *In re Pers. Restraint of Toledo-Sotelo*, 176 Wn.2d 759, 764, 297 P.3d 51 (2013). If a defendant's standard sentence range is the same regardless of a recalculation of his offender score, i.e., if the recalculated score still exceeds 9, any error is harmless. *State v. Priest*, 147 Wn. App. 662, 673, 196 P.3d 763 (2008).

Here, the record contains a judgment and sentence related to each of Smith's convictions from 1997 onward. However, the only evidence in the record supporting pre-1997 convictions is Smith's "individual case history," attached to the State's sentencing memorandum. This document standing alone is insufficient to prove Smith's criminal history. *See Hunley*, 175 Wn.2d at 917. Therefore, we accept the State's concession that it has failed to prove Smith's criminal history for the pre-1997 convictions.

When we consider only the offenses for which the State presented a judgment and sentence, Smith's offender score from prior felonies is 15. When we count his other current offense, Smith's offender score is 16. Although the trial court erred in including Smith's convictions by including his pre-1997 convictions, the error is harmless because, properly calculated, Smith's offender score still exceeded 9. *See Priest*, 147 Wn. App. at 673.

B.      Same Criminal Conduct

1.      Legal Principles

When a trial court calculates a defendant's offender score, multiple offenses that encompass the same criminal conduct are counted as a single offense. This analysis applies both to prior and current offenses. RCW 9.94A.525(5)(a)(i), .589(1)(a).

The process for addressing prior offenses involves two parts. First, if a previous court found that the prior offenses encompassed the same criminal conduct under RCW 9.94A.589(1)(a), that determination is binding. RCW 9.94A.525(5)(a)(i); *State v. Valencia*, 2 Wn. App. 2d 121, 125, 416 P.3d 1275, *review denied*, 190 Wn.2d 1020 (2018). Second, if the defendant has any other prior adult offenses for which sentences were served concurrently, the current sentencing court must determine "whether those offenses shall be counted as one offense or as separate offenses using the 'same criminal conduct' analysis found in RCW 9.94A.589(1)(a)." RCW 9.94A.525(5)(a)(i).

When addressing current offenses, two or more offenses constitute the "same criminal conduct" if they "require the same criminal intent, are committed at the same time and place, and involve the same victim." RCW 9.94A.589(1)(a). If any of these elements is missing, the offenses are not the same criminal conduct. *Valencia*, 2 Wn. App. 2d at 125.

The "same criminal conduct" definition generally applies narrowly to disallow most same criminal conduct claims. *Valencia*, 2 Wn. App. 2d at 125. It is the defendant's burden to establish that two or more offenses encompass the same criminal conduct. *Valencia*, 2 Wn. App. 2d at 125. Each conviction counts towards the defendant's "'offender score *unless* he convinces the court that they involved the same criminal intent, time, place, and victim.'" *Valencia*, 2 Wn. App. 2d at 125 (quoting *State v. Aldana Graciano*, 176 Wn.2d 531, 540, 295 P.3d 219 (2013)).

We review a sentencing court's ruling on "whether two offenses encompass the same criminal conduct for an 'abuse of discretion or misapplication of law.'" *Valencia*, 2 Wn. App. 2d at 126 (quoting *Aldana Graciano*, 176 Wn.2d at 537). In this context, a sentencing court has abused its discretion if the record supports only the opposite conclusion. *Valencia*, 2 Wn. App. 2d at 126. If the record adequately supports either conclusion, the matter is within the sentencing court's discretion. *Valencia*, 2 Wn. App. 2d at 126. A sentencing court also abuses its discretion if it applies the wrong legal standard. *Valencia*, 2 Wn. App. 2d at 126.

The trial court's failure to properly treat crimes as the same criminal conduct is harmless if the defendant's offender score already exceeds 9. *State v. Bobenhouse*, 166 Wn.2d 881, 896-97, 214 P.3d 907 (2009).

### 2.    Prior Convictions

With respect to his prior convictions, Smith points to two of his prior judgment and sentences as evidence that the trial court should have considered some of his prior convictions to be the same criminal conduct. One judgment and sentence, for two theft convictions, provides

date ranges for each conviction that overlap. A second judgment and sentence appears to conclude that six convictions for second degree theft should be counted as only two offenses.[9]

The record does not show that the trial court here conducted any same criminal conduct analysis. Because RCW 9.94A.525(5)(a)(i) makes a same criminal conduct analysis mandatory, the trial court erred in failing to conduct that analysis. However, even if the trial court had counted all of the prior offenses Smith identifies as the same criminal conduct, his prior convictions still yield an offender score of 10. When counting his other current offense, Smith's offender score would be 11.[10] He does not identify any other prior convictions that could arguably be considered the same criminal conduct. Therefore, because under Smith's argument his offender score would exceed 9, the trial court's failure to conduct a same criminal conduct analysis did not prejudice him and is harmless error.[11] *See Bobenhouse*, 166 Wn.2d at 896-97.

Accordingly, we conclude that the trial court abused its discretion in failing to conduct a same criminal conduct analysis for Smith's prior convictions, but that the error was harmless.

### 3. Current Convictions

Smith argues that his current convictions of theft in the first degree and identity theft in the first degree constitute the same criminal conduct. We disagree. The two crimes involve different

---

[9] The judgment and sentence does not expressly state that it considered those convictions to be the same criminal conduct, but Smith's offender score at the time appears to indicate that the court considered those convictions to be the same criminal conduct.

[10] In this scenario, the eight theft convictions would count towards Smith's offender score as only three points rather than eight. This change would reduce his offender score based on prior convictions from 15 to 10.

[11] Smith argues that if the trial court miscalculated his offender score, we should remand for resentencing under *State v. Parker*, 132 Wn.2d 182, 937 P.2d 575 (1997). But the court in *Parker* stated only that "[w]hen the sentencing court incorrectly calculates the *standard range* before imposing an exceptional sentence, remand is the remedy." 132 Wn.2d at 189 (emphasis added). Because Smith's offender score is not below 9, the trial court properly calculated his standard range sentence, and remand is unnecessary.

criminal intents. RCW 9.94A.589(1)(a). In addition, the legislature included anti-merger language in the identity theft statute. RCW 9.35.020(6).

We review a defendant's criminal intent objectively. *State v. Polk*, 187 Wn. App. 380, 396, 348 P.3d 1255 (2015). The analysis involves determining to what extent criminal intent, viewed objectively, changed from one crime to the next. *State v. Tili*, 139 Wn.2d 107, 123, 985 P.2d 365 (1999). Under *State v. Chenoweth*, 185 Wn.2d 218, 223, 370 P.3d 6 (2016), we look to the relevant statutory text to identify objective criminal intent.

In *Chenoweth*, the defendant had been convicted of six counts each of child rape and incest, with each pair of charges based on the same physical act. 185 Wn.2d at 220. Citing the applicable statutes for child rape and incest, the court stated that "objectively viewed, under the statutes, the two crimes involve separate intent. The intent to have sex with someone related to you differs from the intent to have sex with a child." *Chenoweth*, 185 Wn.2d at 223. As additional support, the court noted that the legislature had expressly intended to punish incest and rape as separate offenses. *Chenoweth*, 185 Wn.2d at 224. "[W]here legislative intent is clearly indicated, that intent controls the offender score." *Chenoweth*, 185 Wn.2d at 224.

Here, applying the statutory analysis from *Chenoweth*, Smith's theft and identity theft convictions did not have the same objective criminal intent based on differences in the statutory intent for each crime. The applicable definition of theft, under RCW 9A.56.020(1)(a), is

> [t]o wrongfully obtain or exert unauthorized control over the property or services of another or the value thereof, with intent to deprive him or her of such property or services.

The identity theft statute, RCW 9.35.020(1), states that

> [n]o person may knowingly obtain, possess, use, or transfer a means of identification or financial information of another person, living or dead, with the intent to commit, or to aid or abet, any crime.

19

The intent to commit theft is to exert unauthorized control over another person's property in the present. By contrast, the intent involved in committing identity theft is an intent to acquire identification or financial information of another person for use in the future. The identity theft statute references this difference, and distinguishes acquiring identification or financial information from whatever future crime the defendant will use the identification or financial information to accomplish.

Also as noted in *Chenoweth*, the legislature's intent that two crimes be punished separately controls. 185 Wn.2d at 224. The legislature identified its intent, stating in the identity theft statute that "[e]very person who, in the commission of identity theft, shall commit any other crime may be punished therefor as well as for the identity theft, and may be prosecuted for each crime separately." RCW 9.35.020(6).

Smith argues that both the theft and identity theft crimes involved the same intent of taking money from Spaeth. But that argument ignores the fact that the intent to acquire Spaeth's financial information for use in the future was distinct from Smith's intent to take Spaeth's money in the present.

Further, even if the theft and identity theft convictions should have been treated as the same criminal conduct, Smith has not shown prejudice because his offender score already exceeded 9. *See Bobenhouse*, 166 Wn.2d at 897.

We conclude that the trial court did not err in ruling that Smith's current offenses did not involve the same criminal conduct.

20

III.    SAG

A.    Arrest Warrant

Smith asserts that the trial court improperly issued a warrant for his arrest. He asserts several issues related to the warrant, including that an affidavit supporting the warrant was inadequate, the attorney who completed the affidavit was not a neutral party, and a related police report contained false statements.

None of the documents Smith references is in the record on appeal. We consider only facts contained in the record. *State v. Grier*, 171 Wn.2d 17, 29, 246 P.3d 1260 (2011). Because the record is insufficient, we cannot consider Smith's claims. If Smith wants to rely on facts outside the trial record, he must file a personal restraint petition (PRP). *Grier*, 171 Wn.2d at 29.

B.    Jury Instructions

Smith asserts that the trial court erred by failing to include an instruction on when the jury could presume that Smith had knowledge that Sharyl had stolen the Comdata checks. Smith's argument appears to be that the failure to instruct the jury relieved the State of its burden of proving each element of accomplice liability. We disagree.

Neither the accomplice liability instruction nor any other jury instruction included a presumption. The jury instruction on accomplice liability stated that Smith was an accomplice to a crime if he acted "with knowledge that [listed actions] will promote or facilitate the commission of the crime." CP at 67. Smith does not identify how this instruction or any other would allow the jury to presume that he had knowledge that Sharyl had stolen the Comdata checks.

C.    Burden Shifting

Smith asserts that the prosecutor committed misconduct by improperly shifting the burden of proof during her closing argument. We disagree.

To show prosecutorial misconduct, a defendant bears the burden of proving the prosecutor's conduct was both improper and prejudicial. *State v. Thorgerson*, 172 Wn.2d 438, 442, 258 P.3d 43 (2011). We review a prosecutor's allegedly improper statements in the context of her total argument, the issues in the case, the evidence raised in argument, and the jury instructions. *State v. Anderson*, 153 Wn. App. 417, 427, 220 P.3d 1273 (2009). In determining whether misconduct occurred, we first consider whether the contested statements were improper. *Anderson*, 153 Wn. App. at 427. If they were and if the defendant objected, we consider whether there was a substantial likelihood that the improper argument affected the jury. *Anderson*, 153 Wn. App. 427.

Where a defendant fails to object to alleged prosecutorial misconduct, he is deemed to have waived any error unless he shows the "misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *Emery*, 174 Wn.2d at 760-61. To meet this heightened standard, "the defendant must show that (1) 'no curative instruction would have obviated any prejudicial effect on the jury' and (2) the misconduct resulted in prejudice that 'had a substantial likelihood of affecting the jury verdict.'" *Emery*, 174 Wn.2d at 761 (quoting *Thorgerson*, 172 Wn.2d at 455).

The State generally has wide latitude to make arguments and draw reasonable inferences from the evidence. *State v. Osman*, 192 Wn. App. 355, 367, 366 P.3d 956 (2016). This latitude includes commenting on the quality and quantity of the defense's evidence. *Osman*, 192 Wn. App. at 367. The mere mention that the defense's evidence is lacking does not shift the burden of proof.

*Osman*, 192 Wn. App. at 367. However, the prosecutor may commit misconduct by mentioning that the defense did not present witnesses or stating that the jury should find the defendant guilty because the defendant failed to present evidence to support his theory. *Anderson*, 153 Wn. App. at 428.

Here, Smith points to two arguments by the prosecutor. First, while attempting to anticipate a rebuttal argument by defense counsel that the State did not present certain testimony, the prosecutor argued that the defense would always be able to point to the absence of some evidence. The prosecutor argued, "If [Sharyl] testified, they can say [Sharyl] didn't admit anything. If she admitted something, they can argue, well, you didn't collect the surveillance video or you didn't dust for fingerprints." 3 RP (Mar. 2, 2017) at 415-16. Although the court sustained an objection to this argument, the prosecutor's argument did not shift any burden. Rather, the prosecutor merely argued about the lack-of-evidence argument she anticipated from the defense. The prosecutor did not act improperly in making it.

Second, the prosecutor ended her argument by asking the jury to find Smith guilty and ended her reply by stating that the evidence showed beyond a reasonable doubt that Smith was guilty. This argument relied on reasonable inferences from the evidence; therefore, the prosecutor's argument was neither improper nor shifted the burden of proof.

Smith also asserts that the prosecutor vouched for the credibility of a witness. We do not consider this assertion because Smith has not identified with specificity what he means. We will not search the record to support a defendant's SAG claim. *State v. O'Connor*, 155 Wn. App. 282, 293, 229 P.3d 880 (2010).

D.    Amendment of Information

Smith asserts that the trial court erred in allowing the State to amend the charges against him on the day before trial. We disagree.

Article 1, section 22 of the Washington Constitution requires that a defendant be adequately informed of the charges against him and protects defendants from being tried for an offense not charged. *State v. Ziegler*, 138 Wn. App. 804, 808, 158 P.3d 647 (2007). Consistent with that right, CrR 2.1(d) allows the State to liberally amend the defendant's charging information "at any time before verdict or finding if substantial rights of the defendant are not prejudiced" with the trial court's permission.

In determining whether amendment was proper, the issue is whether the defendant's substantial rights have been prejudiced. A bright-line rule applies after the State rests its case in chief. *Ziegler*, 138 Wn. App. at 809. At that point, amendment is allowed only for a lesser degree of the same charge or a lesser-included offense; any other amendment is reversible error per se. *Ziegler*, 138 Wn. App. at 809.

Before the State rests, the defendant has the burden of demonstrating prejudice. *Ziegler*, 138 Wn. App. at 809. Particularly relevant is the timing of the amendment and the extent of any change to the charges. *See Ziegler*, 138 Wn. App. at 809-10. A defendant demonstrates prejudice through a showing of unfair surprise or that he is unable to prepare a defense. *State v. James*, 108 Wn.2d 483, 489, 739 P.2d 699 (1987). By contrast, prejudice is less likely when an amendment specifies a different manner of completing the same crime originally charged or charges a lower degree of the original charge. *State v. Schaffer*, 120 Wn.2d 616, 621, 845 P.2d 281 (1993).

We review a trial court's decision to allow the State to amend the charge for an abuse of discretion. *State v. Lamb*, 175 Wn.2d 121, 130, 285 P.3d 27 (2012). A trial court abuses its

discretion if its decision is manifestly unreasonably or is based on untenable grounds or untenable reasons. *Lamb*, 175 Wn.2d at 127.

In determining whether an amendment is prejudicial, our decision in *Ziegler* is instructive. In *Ziegler*, the defendant was charged with multiple instances of child rape and child molestation related to two victims. 138 Wn. App. at 806. After the victims testified but before the state rested, the state moved to amend one count of rape related to one victim to child molestation and add two child rape charges against the other victim. *Ziegler*, 138 Wn. App. at 806-07.

We held that the first amendment was not prejudicial because "the lack of additional discovery or a continuance did not adversely affect [the defendant's] defense." *Ziegler*, 138 Wn. App. at 810. However, the addition of two rape charges "was not merely the amendment from one crime to a similar charge." *Ziegler*, 138 Wn. App. at 811. We concluded that the new charges affected the defendant's ability to prepare a defense, and that his trial strategy and plea negotiations would likely have been different had he known of the two additional charges earlier. *Ziegler*, 138 Wn. App. at 811. Therefore, the additional charges violated the defendant's right to know of and defend against the charges. *Ziegler*, 138 Wn. App. at 811. We vacated the convictions on the two improper charges. *Ziegler*, 138 Wn. App. at 811.

Here, the State amended Smith's charging information the day before trial. The initial information charged Smith with only theft in the first degree. The amended information added identity theft in the first degree as well as adding for both charges a major economic offense aggravator and an accomplice mode of commission. Smith did not object or request a continuance.

Smith has not demonstrated that the trial court abused its discretion in allowing the State's amendment. First, the identity theft charge involved the same factual questions as the original theft charge. *See Schaffer*, 120 Wn.2d at 622 ("[T]he new theory presented in the amended

information arose out of the same general factual circumstance."). For both charges, the relevant issue was whether Smith had acquired the Comdata checks using numbers provided by Sharyl. Similarly, the aggravator and accomplice mode of commission did not require Smith to pursue any additional investigation.

Second, Smith's legal theory, that the State failed to prove that the transactions were unauthorized, was equally applicable to the original and added charges. Smith does not argue that he was unable to present a defense for identity theft or that he would have been able to present additional argument had he received more time to prepare. Further, he decided not to request a continuance at the time. *See State v. Gosser*, 33 Wn. App. 428, 435, 656 P.2d 514 (1982) ("The fact a defendant does not request a continuance is persuasive of lack of surprise and prejudice.").

As a result of the same general factual and legal questions at issue in Smith's original and amended information, he has not demonstrated prejudice. This case is unlike the additional rape charges in *Ziegler*, which were necessarily based on events that the initial information did not anticipate, and which could have impacted the defendant's trial strategy and plea negotiations. 138 Wn. App. at 810-11. Smith makes no similar argument here, regarding how his strategy before trial or at trial might have changed.

Accordingly, we conclude that the trial court did not abuse its discretion in allowing the State to amend Smith's charging information.

E. Ineffective Assistance

Smith asserts that defense counsel provided ineffective assistance by failing to request a continuance after the State filed the amended information. We disagree.

We review claims for ineffective assistance of counsel de novo. To prevail on a claim of ineffective assistance, Smith must show both (1) that defense counsel's representation was

26

deficient, and (2) that the deficient representation prejudiced the defendant. *Grier*, 171 Wn.2d at 32-33. Representation is deficient if, after considering all the circumstances, the performance falls "'below an objective standard of reasonableness.'" *Grier*, 171 Wn.2d at 33 (quoting *Strickland v. Washington*, 466 U.S. 668, 688, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). Prejudice exists if there is a reasonable probability that except for counsel's deficient performance, the result of the proceeding would have differed. *Grier*, 171 Wn.2d at 34.

We are highly deferential in our scrutiny of defense counsel's performance and employ a strong presumption that defense counsel acted reasonably. *Grier*, 171 Wn.2d at 33.

Here, Smith does not identify how defense counsel's decision not to request a continuance was deficient. Although defense counsel's duty to provide effective assistance included an obligation to investigate, *State v. Jones*, 183 Wn.2d 327, 339, 352 P.3d 776 (2015), the record does not show that defense counsel failed to investigate Smith's case. Even though the State added the identity theft charge shortly before trial, that charge was intimately related to the existing theft charge and was based on the same general facts. There is no reason to conclude that defense counsel's investigation of the initial theft charge was not adequate to allow him to make informed decisions regarding the identity theft charge, to present a defense, and to not request a continuance. *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 721, 101 P.3d 1 (2004).

Because Smith has not shown his counsel was deficient, his claim fails.

F.      Lesser Included Offense

Smith appears to assert that theft is a lesser included offense of identity theft, and that the trial court erred by failing to provide an instruction for a lesser included offense. An offense qualifies as a lesser included offense if (1) each element of the lesser offense is a necessary element

of the charged offense and (2) the evidence supports an inference that the defendant committed the lesser crime. *State v. Sells*, 166 Wn. App. 918, 926, 271 P.3d 952 (2012).

Applying this test, the court in *Sells* held that identity theft in the second degree is not a lesser included offense of theft in the third degree because the two crimes require different elements. 166 Wn. App. at 926. Theft requires proof that the defendant wrongfully obtained property of another with intent to deprive, RCW 9A.56.020(1)(a); identity theft requires proof that the defendant "obtain, possess, use, or transfer" another person's identification or financial information. RCW 9.35.020(1). Therefore, neither crime can be a lesser included offense of the other. The trial court in this case did not err in not giving a lesser included offense instruction.

G.      Major Economic Offense Aggravator

Smith asserts that there was insufficient evidence to convict him of the major economic offense aggravator. Specifically, he asserts that the State failed to present that his crimes involved multiple victims. We disagree.

Article I, section 21 of the Washington Constitution guarantees criminal defendants the right to a unanimous jury verdict. *State v. Armstrong*, 188 Wn.2d 333, 340, 394 P.3d 373 (2017).

Here, the major economic offense aggravator stated:

> To find that this crime is a major economic offense, at least one of the following factors must be proved beyond a reasonable doubt:
> (1) The crime involved multiple victims or multiple incidents per victim; or
> (2) The crime involved attempted or actual monetary loss substantially greater than typical for the crime; or
> (3) The crime involved a high degree of sophistication or planning or occurred over a lengthy period of time; or
> (4) The defendant used his or her position of trust, confidence, or fiduciary responsibility to facilitate the commission of the crime.

CP at 81. The court instructed the jury in accord with the statute. RCW 9.94A.535(3)(d).

Smith asserts that the means to commit a major economic offense includes not only the four numbered items under RCW 9.94A.535(3)(d), but also subparts within each item. Therefore, he asserts, the State had to prove that his crime involved multiple victims and multiple incidents per victim, and that because the State presented evidence of only one victim, Spaeth, the trial court erred in applying the major economic offense aggravator. We disagree with Smith's reading of the statute.

The plain language of RCW 9.94A.353(3)(d)(i) requires a finding beyond a reasonable doubt that the crime involved "multiple victims or multiple incidents per victim." Smith argues we should replace the word "or" with an "and." We decline to do so.

Under the structure of RCW 9.94A.535(3)(d), the State only had to prove one of the four enumerated means, not the subparts listed within each means. *Cf. State v. Lindsey*, 177 Wn. App. 233, 240-42, 311 P.3d 61 (2013). Here, the State presented evidence that the crime involved 176 transactions and the transactions involved over $250,000. The State clearly proved beyond a reasonable doubt that the crime involved a "monetary loss substantially greater than typical for the crime." RCW 9.94A.535(3)(d)(ii). That proof sufficiently proved the aggravating factor.

H.      Miscellaneous Evidentiary and Testimony Issues

Smith asserts that several issues occurred at trial related to the admission of evidence and witness testimony. We disagree.

1.      Comdata Codes

Smith asserts that the trial court erred in admitting evidence regarding the Comdata codes. He cites ER 901(a), which addresses authentication of evidence. We disagree.

To authenticate evidence, the proponent must provide sufficient proof to support a finding that the evidence is what the proponent claims it to be. *State v. Young*, 192 Wn. App. 850, 854,

369 P.3d 205 (2016). One method is through the testimony of a witness with knowledge. *Young*, 192 Wn. App. at 855.

But Smith does not identify what evidence he believes was inadequately authenticated, and none of the exhibits presented or admitted at trial is in the record. The only admitted evidence that could have included the Comdata numbers was a set of photocopies of the Comdata checks, which Ingalls addressed in her testimony. Smith did not object to admission of that evidence at the time, and Ingalls explained that the admitted evidence was photocopies of the checks. Accordingly, Smith failed to show that the trial court erred in admitting evidence related to the Comdata codes.

### 2. Handling of Evidence

Smith asserts that the trial court erred by allowing the State to remove evidence from the courtroom and by resolving evidentiary issues related to that evidence outside the jury's presence. He references the State's direct examination of officer Johnny Rivera, who testified about the investigation at Spaeth. During the State's examination, it presented Rivera with an exhibit that included several pages of a ledger as well as copies of the Comdata checks. Rivera stated that he recognized the checks but had not previously seen the ledger. To clarify what portion of the exhibit could be admitted, the State questioned Rivera outside of the jury's presence. Smith was present and did not object to the questioning or to the admission of the checks into evidence.

No impropriety occurred in this exchange. The record does not show that the State removed evidence from the courtroom. To the extent that Smith's argument depends on evidence outside the record, he must present supporting evidence and raise the argument in a PRP. *Grier*, 171 Wn.2d at 29.

Additionally, the trial court did not err by allowing the State to question Rivera regarding the exhibit outside the jury's presence. Preliminary questions concerning admissibility of evidence

are to be determined by the court under ER 104(a). Smith asserts that the jury was unable to determine what weight to give the evidence. But the jury was present after the evidence was admitted, and Smith had an opportunity to question Rivera about it. In addition, Smith did not object at the time. Therefore, he cannot raise this argument for the first time on appeal. RAP 2.5(a)(3); *State v. Koss*, 181 Wn.2d 493, 502, 334 P.3d 1042 (2014) (noting that manifest errors affecting a constitutional right may be raised for the first time on appeal).

### 3. Ingalls's Testimony

Smith asserts that testimony by Ingalls was improper because she lacked personal knowledge to support her testimony about whether Sharyl wrote the Comdata checks and because her testimony improperly shifted the burden of proof. We resolved this issue above and do not readdress it. *State v. Thompson*, 169 Wn. App. 436, 493, 290 P.3d 996 (2012).

### 4. Confrontation Clause Violation

Smith asserts that testimony by Ingalls and testimony regarding Spaeth's president at the time of the theft, Robert Loidhamer, violated the Sixth Amendment's confrontation clause. We disagree.

The confrontation clause provides a defendant with "the right 'to be confronted with the witnesses against him.'" *State v. Jasper*, 174 Wn.2d 96, 109, 271 P.3d 876 (2012) (quoting U.S. CONST. amend VI). This right applies against witnesses who "'bear testimony,'" defined as a "'declaration or affirmation made for the purpose of establishing or proving some fact.'" *Jasper*, 174 Wn.2d at 109 (internal quotation marks omitted) (quoting *Crawford v. Washington*, 541 U.S. 36, 51, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)). Under the confrontation clause, testimonial statements may not be introduced as evidence except where the witness is unavailable and the defendant had a prior opportunity for cross-examination. *Jasper*, 174 Wn.2d at 109.

With respect to Ingalls, no confrontation clause violation existed because Ingalls was available for cross-examination. With respect to Loidhamer, Smith has not identified any improper testimonial statements by Loidhamer that were admitted, and we have found none. Therefore, Smith's claim fails.

I.      Appearance of Fairness

Smith asserts that a variety of persons involved in his trial had improper relationships and argues that he was prejudiced as a result.[12]    However, Smith's allegations of prejudice are conclusory, and nothing in the record provides any evidence as to the relationships Smith alleges. Accordingly, Smith's claim fails.

J.      Jury Selection

Smith asserts that the trial court erred in improperly allowing the State to exercise a peremptory challenge after the State had already accepted the jury panel. We disagree.

Jury selection and the exercise of peremptory challenges is governed by court rule and statute. Under CrR 6.4(e)(2), "[a]cceptance of the jury as presently constituted shall not waive any remaining peremptory challenges to jurors subsequently called." A similar rule in RCW 4.44.210 provides that if one party declines to exercise a peremptory challenge, "that party may no longer peremptorily challenge any of *the jurors in the group for which challenges are then being considered* and may only peremptorily challenge any jurors later added to that group." (Emphasis added.). Under these provisions, a party may exercise a peremptory challenge after previously accepting a previous iteration of the jury panel. *State v. Bird*, 136 Wn. App. 127, 133, 148 P.3d 1058 (2006). Here, the State properly exercised its peremptory challenges as to a new

---

[12] Smith alleges various relationships between the trial judge, other Kitsap County judges, the elected county prosecutor, Loidhamer, and defense counsel.

prospective juror called after the State accepted the rest of the panel. Because the State acted properly, the court did not err.

K.      CrR 4.7

In a supplemental SAG, Smith argues that the State violated CrR 4.7 by not disclosing tax forms. Because there is nothing in the record to show either that the State had the records or that it failed to provide them to Smith's lawyer, this assertion fails.

We also are unable to review any vouching arguments made by Smith.

We affirm Smith's convictions and sentence.

_____
                        Melnick, J.

We concur:


_____
        Bjorgen, J.


_____
        Lee, A.C.J.